UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

THOMAS PETER WICKER,

          Petitioner,                     Case No. 1:05-cv-402

v.                                     Honorable Wendell A. Miles

CARMEN PALMER,

          Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted by a jury in the Saginaw County Circuit Court of assault with intent to great body harm less than murder, MICH. COMP. LAWS § 750.84, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 769.12. On November 19, 1998, the trial court sentenced him as an habitual offender to life imprisonment for the assault conviction and two years for the felony-firearm conviction. In his *pro se* petition and supporting brief (dockets #1-2), Petitioner raises six grounds for relief, as follows:

I.     The trial court failed to properly instruct the jury on the name of the complainant and the date of the offense in question, violating Petitioner's due process right to a jury properly instructed on all essential elements of the offense.

II.    Petitioner was denied his constitutional right to present a defense and to the effective assistance of counsel under the Sixth and Fourteenth Amendments when his trial attorney failed to present the testimony of two witnesses, one who was with the complainant at the time the complainant claimed that the incident occurred and the other who stated the complainant told him [that] Petitioner did not shoot at [the complainant].

III.    Petitioner was denied his Sixth Amendment right to the effective assistance of counsel because Petitioner suffered prejudice as a result of the cumulative effect of trial counsel's errors.

IV.    Petitioner was denied a fair trial when the court admitted highly prejudicial evidence of other bad acts that had little or no probative value.

V.    The trial court abused its discretion by denying Petitioner's motion for relief from judgment and motion for evidentiary hearing where the appellant showed good cause and actual prejudice.

VI.    Petitioner was denied his Sixth Amendment right to the effective assistance of appellate counsel when counsel failed to file a supplemental brief after remand.

On July 22, 2005, Petitioner filed a supplemental brief concerning his fifth and sixth grounds for habeas corpus relief (docket #7). Respondent filed an answer to the petition (docket #13) and Petitioner filed a reply (docket #38). Upon review and applying the AEDPA standards, I find that Petitioner's claims are procedurally defaulted or are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

Petitioner was charged in a four-count information with (1) assault with intent to murder Anthony Thomas and/or Robert Mason, (2) possession of a firearm during the commission of a felony, (3) being a felon in possession of a firearm, and (4) first-degree home invasion. Petitioner was put on notice that he could be sentenced as a fourth habitual offender. Count three was dismissed by the prosecutor. Petitioner was tried on the remaining three counts on November 12-19, 1998.

Anthony Thomas testified that he knew Robert Mason from the music business. Mason had a rap group and Thomas worked for him as a music engineer. (Tr. II, 15.) On March

- 2 -

25, 1998, Thomas was working with Mason at the Play Style Music Studios at 1717 East Genesee in Saginaw. (Tr. II, 16, 22.) As Thomas walked to his car in the parking lot, a lime green Cadillac pulled up quickly. Thomas sensed that something was wrong and took off running. (Tr. II, 17.) He saw four black men in the Cadillac. (Tr. II, 18.) When the car was gone, Petitioner went back to his car and called 911 to report the incident. (*Id.*) The dispatcher told Thomas to stay where he was until the police arrived. (*Id.*) While Thomas was sitting in his car waiting for the police, the Cadillac came back. (*Id.*) One of the men got out of the car and walked up to Thomas' car window, saying "I'm Peter Rabbit. I kill you. I kill your mama. I kill whoever." (Tr. II, 20.) Thomas identified the man as Petitioner. (Tr. II, 21.) Thomas had never met Petitioner before that incident. (Tr. II, 20.) Thomas provided the police with the name "Peter Rabbit" and identified the other men who were involved in the incident. (Tr. II, 21.)

On April 29, 1998, Thomas went to look for Rob Mason at his house located at 3250 Bundy in Saginaw. They planned to go to the recording studio to listen to a "dat," a final mix tape that can be turned into a CD or sent to a record label. (Tr. II, 15-16, 23-24.) After three or four attempts, Thomas found Mason at home. (Tr. II, 35.) They drove separate cars to the studio. (Tr. II, 24.) Mason was driving a Cadillac Fleetwood and Thomas was driving his customized Cadillac Seville. (Tr. II, 23.) They returned to Mason's house just before midnight. Thomas pulled into the driveway behind Mason. (Tr. II, 25.) Thomas noticed a guy peeking from around the corner of the house and another guy coming from around a Winnebago that was parked behind the house. (Tr. II, 25-28.) Three to four men opened fire on Thomas' car. Most of the men were wearing masks, but Thomas saw Petitioner's face because he was wearing only a hood. (Tr. II, 28-30.) Petitioner had a pistol in his hand and was shooting toward Thomas. (Tr. II, 32.) Thomas ducked out of his

- 3 -

car and ran.  (Tr. II, 28, 32.)  When Thomas later returned to his car, the windows were broken out and it had several bullet holes in the body.  (Tr. II, 36.)  Thomas believed that he would have been shot if he had not fled his car.  (Tr. II, 37.)  Initially, Thomas did not tell the police that Petitioner was involved in the incident because Thomas planned to retaliate against Petitioner in his own way.  (Tr. II, 39.)  Thomas changed his mind after a couple of days and gave another statement to the police.  (Tr. II, 40.)

Rob Mason testified that he and Thomas arrived at his house just before midnight on April 29, 1998.  Mason planned to go into the house to get some money that he owed Thomas.  (Tr. II, 102.)  As Mason approached the house, he noticed that lights were on in the house even though he had turned them off before he left.  (Id.)  Mason pulled up near the back door and got out of his car.  (Tr. II, 87, 104.)  He immediately saw Petitioner and some other men.  (Tr. II, 83-86.)  Petitioner and the other men had guns and were shooting from "everywhere."  (Tr. II, 87, 115.)  Mason believed that they were after Thomas.  (Tr. II, 87, 90.)  Mason got down on the ground by his car.  As the shooting continued, Mason saw Thomas run away from his car.  (Tr. II, 88.)  When the shooting stopped after about thirty seconds, Mason got back in his car, backed out of the driveway and left to get some guns.  (Id.)  He had enough room in the driveway to back around Thomas' car.  (Tr. II, 88-89.)  As he drove down the street, he ran into a police barricade.  (Tr. II, 89.)  After the police determined that Mason was unarmed, they escorted him back to his house.  (Tr. II, 91.)  Mason found that his house was severely damaged:  the back door had been pried open and was hanging open on its hinges, the window was torn off, the bedroom windows were shot out, the exterior siding had bullet damage, and the inside of the house was ransacked.  (Tr. II, 93-95.)  A ring and a watch were missing from the house.  (Tr. II, 95.)

Paul Cowley, an FBI agent, testified that on March 25, 1998, at about 8:00 p.m. he was working in Saginaw with a gang task force. As he and Agent Michael Van Horn drove north on East Genesee in an unmarked van, Cowley observed three men standing outside Thomas' car. One of the men was assaulting Thomas. (Tr. II, 130-31.) The agents intervened and the three men fled. Agent Van Horn apprehended one of the men, Duane "Little Rab" Jilks, and placed him under arrest. (Tr. II, 133; Tr. III, 36.) While Cowley could not positively identify the man he saw assaulting Thomas, he testified that the man's general physical description was not consistent with Jilks, but was consistent with Petitioner. (Tr. III, 36-38.) When Thomas got out of his car, Cowley secured him on the ground. As he was lying on the ground, Thomas stated, "It's Peter Rabbit, it's Peter Rabbit." (Tr. II, 132.) Thomas was taken to the police station for questioning, but was not arrested. (Tr. III, 39-40.)

Saginaw Police Officer Erik Skabardis testified that he was working in the area of Mason's house on the night of April 29-30, 1998. (Tr. II, 135.) Skabardis responded to a call regarding a shooting incident, but was not given an address. As Officers Skabardis and Albert Fong were speaking to a group of men standing at the corner of Gilmore and Russell, Mason drove up and provided information about the shooting. (Tr. II, 138-39.) Mason, who appeared scared and excited, stated that Peter Rabbit was involved in the shooting. (Tr. II, 150.) Mason followed the officers back to his residence. (Tr. II, 139.) The officers searched the outside of the house and found that forced entry had been made on the east side. As a result of damage to the door, the officers had to force it open to enter the house. (Tr. I, 142.) The window next to the door also was smashed and the bars had been ripped off. (Tr. I, 142-43.) The officers did not find anyone inside the house, but found that it was ransacked. (Tr. II, 143-45.) Officer Skabardis observed damage to the car parked

- 5 -

in the driveway.  The windows were smashed and there were bullet holes in the body.  (Tr. II, 146.)

He also saw bullet holes in the side of the house and the motor home parked behind the house.  (*Id.*)

Officers went looking for Thomas because they were concerned that he may have been shot.  (Tr.

II, 151.)  Thomas returned to Mason's house unharmed.  (Tr. II, 151-53.)  Skabardis assisted in

recovering three .380 caliber bullet casings from the area near the back door.  (Tr. II, 147, 155.)

According to Skabardis, those casings are used in a .380 caliber semiautomatic weapon.  (Tr. II,

148.)

Saginaw Police Detective Vince Sanchez testified that he first investigated the

incident between Thomas and Petitioner that occurred in March 1998.  (Tr. II, 164.)  As the result

of information developed in that investigation, a search warrant was executed on a residence in the

City of Saginaw where Petitioner was believed to reside.  (Tr. II, 164-65.)  Petitioner's mother and

grandmother were home at the time the warrant was executed.  (Tr. II, 165.)  After the search,

Petitioner called Sanchez and asked why police searched his grandmother's house and confiscated

some of his personal property.  (Tr. II, 166.)  Sanchez told Petitioner that they were looking for

evidence of his residence and any evidence pertaining to the assault that occurred on March 25.  (Tr.

II, 168.)  Petitioner told Sanchez that he would come to the station to discuss the matter.  (*Id.*)  The

police took statements from Mason and Thomas after the incident on April 29-30.  (Tr. II, 169.)  As

a result of investigation, Sanchez obtained an arrest warrant for Petitioner on May 2.  (*Id.*)

Jeffrey Kaylor, an Identification Bureau officer with the Saginaw Police Department,

assisted with the investigation of the April 29-30 incident at Mason's residence.  He identified a

spent .380 caliber bullet casing found near the back door of Mason's house.  (Tr. II, 189.)  A second

spent .380 caliber bullet casing was found across the street from Mason's house.  (Tr. II, 196.)

Kaylor did not know whether the two casings were fired from the same gun.  (Tr. II, 209.)  A large caliber slug was found laying in the driveway.  (Tr. II, 189-91.)  A pellet was removed from the side of the house that appeared to come from a shotgun.  (Tr. II, 191.)  Kaylor observed three bullet holes on the passenger side of the motor home.  (Tr. II, 194.)  Kaylor found a bullet hole going through a cabinet inside the motor home and a spent bullet in the oven door.  (Tr. II, 197-99.)  A lead fragment also was found under the window on the exterior of the motor home. (Tr. II, 192.)  Inside the house, Kaylor found two bullet holes on the south wall of the bedroom.  (Tr. II, 206.)  One spent copper-jacketed bullet was removed from the wall.  (Tr. II, 207.)  Kaylor testified that Petitioner's fingerprints were not found on any evidence collected in the case.  (Tr. II, 204.)

Tracy Young testified that she used to date Petitioner and that they remained friends. (Tr. III, 3.)  Young testified that she went fishing with Petitioner on the afternoon of April 29, 1998. (Tr. III, 4.)  She met him at the river at 4:00 p.m. and they stayed until 9:00 or 9:30 p.m.  (Tr. III, 5.)  After that, they went to Petitioner's mother's house on 12th Street.  (*Id.*)  At about 11:30 p.m., Young and Petitioner went home to their apartment at the Vista Villa Apartments.  (Tr. III, 6.) According to Young, Petitioner stayed home for the rest of the night.  (*Id.*)

Marilyn Moore, Petitioner's grandmother, testified that she took Petitioner to the fish bank on the afternoon of April 29, 1998.  (Tr. III, 9.)  She saw him again at 8:30 or 9:00 p.m. that evening at her home at 726 South 12 Street.  (*Id.*)  Petitioner left with Young between 11:30 p.m. and midnight.  (Tr. III, 10.)  Sometime during the evening, a group of young men stopped and visited with Petitioner on the front porch.  (Tr. III, 12, 14.)  The men included Little Rab and Dexter Orosco.  (Tr. III, 15.)  Moore did not know or could not recall the rest of their names.  (Tr. III, 14.) Moore testified that she was upset by the search of her home in March 1998 because she had just

been released from the hospital.  (Tr. III, 16.)  Moore also was upset because the officers were not very nice and took her daughter's leather coat and money.  (*Id.*)

Petitioner testified that his grandfather gave him the nickname Peter Rabbit.  (Tr. III, 18.)  With regard to the March 25 incident, Petitioner testified that he drove to the recording studio with his friends Duane [Jilks] and Dexter.  (Tr. III, 20.)  Duane Jilks' street name is Little Rab.  (Tr. III, 30.)  Petitioner was driving his grandmother's lime green Cadillac.  (Tr. II, 33.) When they arrived, there were six or seven people standing outside the studio.  According to Petitioner, Thomas asked Jilks if he could talk to him.  (Tr. III, 20, 28.)  Petitioner testified that Jilks went over by Thomas' car to talk, and the next thing Petitioner knew, Jilks and Thomas were fighting.  (Tr. III, 20.)  The police arrived and broke-up the fight.  (*Id.*)  Petitioner claimed that he walked back into the studio when the police arrived.  (*Id.*)  Petitioner testified that he did not know Thomas at that time and had no reason to threaten him.  (Tr. III, 21.)  He denied that he approached Thomas' car or assaulted him.  (Tr. III, 29.)  Petitioner further stated that he never saw Robert Mason until the preliminary examination in this case on May 18, 1998.  (Tr. III, 21.)

Petitioner testified that he went fishing on April 29 from 4:00 or 5:00 p.m. until about 9:30 p.m.  (Tr. III, 23.)  After fishing, he went to 726 South 12th Street.  (Tr. III, 23.) While he was on the front porch, some people from across the street came over to visit.  (Tr. III, 23-24).  According to Petitioner, Lawrence Coats and Dexter Orosco were not among the visitors.  (Tr. III, 24-25.)  He left with Young between 11:30 p.m. and midnight and they went directly to her apartment in the Vista Villa complex.  (Tr. III, 24, 26.)  Petitioner testified that he took a shower and went to bed.  (Tr. III, 27.)  Petitioner claimed that he did not go out again until the next day and denied any involvement in the shooting incident at Mason's house.  (Tr. III, 24, 32.)

- 8 -

Petitioner testified that his grandmother was upset about the search of her residence. (Tr. III, 25.) Petitioner admitted that he called Detective Sanchez about the search, but claimed that Sanchez told him that they were searching for drugs. (*Id.*) Petitioner testified that 726 South 12th Street was his legal address in March and April 1998. (Tr. III, 23.) He denied being aware that the police were looking for him at that address after the shooting incident on April 29-30. (Tr. III, 31.) Petitioner ultimately was arrested at the residence of a friend of Petitioner's mother. (*Id.*)

At the conclusion of trial on November 19, 1998, the jury found Petitioner guilty of assault with intent to great body harm less than murder and possession of a firearm during the commission of a felony. (Tr. IV, 80.) The jury found him not guilty of first-degree home invasion. (*Id.*) On December 23, 1998, the trial court sentenced Petitioner as an habitual offender to life imprisonment for the assault conviction and two years for the felony-firearm conviction. (Sentencing Transcript, (S. Tr.), 16, docket #22.)

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on September 13, 1999, raised the following two claims of error:

I.   DID THE TRIAL COURT FAIL TO PROPERLY INSTRUCT THE JURY ON THE NAME OF THE COMPLAINANT AND DATE OF THE OFFENSE IN QUESTION IN VIOLATION OF MR. WICKER'S DUE PROCESS RIGHT TO A JURY PROPERLY INSTRUCTED ON ALL ESSENTIAL ELEMENTS OF THE OFFENSE.

II.  WAS DEFENDANT DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE AND TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS WHEN (1) HIS TRIAL ATTORNEY FAILED TO PRESENT THE TESTIMONY OF TWO WITNESSES, ONE WHO WAS WITH THE COMPLAINANT DURING THE TIME THE COMPLAINANT CLAIMED THE INCIDENT OCCURRED AND ONE WHO STATED THE COMPLAINANT TOLD HIM DEFENDANT DID NOT SHOOT AT HIM

- 9 -

AND (2) FOR FAILING TO REQUEST THE JURY BE INSTRUCTED ON
USE OF PRIOR BAD ACTS EVIDENCE.

(See Def.-Appellant's Br. on Appeal, docket #29.)  Petitioner filed a motion to remand so that he

could file a motion for new trial on the ground that he was denied the ineffective assistance of

counsel.  The Michigan Court of Appeals granted his motion on October 29, 1999, and remanded

the case to the trial court for a *Ginther*[1] hearing.   (*See* 10/29/99 Mich. Ct. App. Ord, docket #29.)

The court of appeals retained jurisdiction and ordered that the time for proceeding with the appeal

would begin upon issuance of an order in the trial court that finally disposed of the post-conviction

proceedings.

Petitioner filed a motion for new trial asserting that his trial counsel was ineffective

for:  (1) failing to request a jury instruction with regard to identity of the alleged victim; (2)  failing

to request a limiting instruction regarding "bad acts" evidence; and (3) failing to interview and/or

present the testimony of two witnesses.   Following a *Ginther* hearing, the trial court issued an

opinion and order denying Petitioner's motion for a new trial.  (*See* 2/1/00 Op. and Ord. of Saginaw

County Circuit Court, docket #30.)  By unpublished opinion issued on May 15, 2001, the Michigan

Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and

sentences.  (*See* 5/15/01 Mich. Ct. App. Opinion (MCOA Op.), docket #29.)  Petitioner filed a *pro

per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same two

claims raised before and rejected by the Michigan Court of Appeals.  By order entered November

30, 2001, the Michigan Supreme Court denied his application for leave to appeal because it was not

persuaded that the questions presented should be reviewed.  (*See* 11/20/01 Mich. Ord., docket #30.)

---

[1]*People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

### C.  Motion for Relief from Judgment

Petitioner subsequently filed a motion for relief from judgment in the Saginaw

County Circuit Court, raising the following claims of error:

I.      MUST THE CONVICTION OF [DEFENDANT] BE REVERSED BECAUSE OF THE MANY INSTANCES OF PROSECUTORIAL MISCONDUCT AND BECAUSE DEFENSE COUNSEL FAILED TO OBJECT TO SUCH PROSECUTORIAL MISCONDUCT.

II.     IS A NEW TRIAL REQUIRED BECAUSE DEFENDANT WAS DENIED A FAIR TRIAL WHERE THE TRIAL COURT ABUSED ITS DISCRETION BY ADMITTING EVIDENCE OF LITTLE OR NO PROBATIVE VALUE WHICH UNFAIRLY PREJUDICED DEFENDANT'S RIGHT TO A FAIR TRIAL.

III.    WAS THE DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL REQUIRED UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND MADE APPLICABLE TO THE STATE OF MICHIGAN THROUGH THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION BECAUSE OF TRIAL COUNSEL'S NUMEROUS ERRORS, AND THUS, IS DEFENDANT ENTITLED TO REVERSAL OF HIS CONVICTION AND A NEW TRIAL.

IV.     WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE HIS APPELLATE COUNSEL DID NOT RAISE THE ABOVE ISSUES IN HIS APPEAL OF RIGHT.

The trial court denied his motion on February 5, 2003.  (*See* 2/5/03 Op. & Ord. of Saginaw County

Circuit Court, docket #28.)

Petitioner subsequently raised the following claims in his applications for leave to appeal in

the Michigan appellate courts:

I.      THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO GRANT DEFENDANT-APPELLANT'S MOTION FOR RELIEF FROM JUDGMENT AND FOR AN EVIDENTIARY HEARING WHERE THE APPELLANT SHOWED GOOD CAUSE AND ACTUAL PREJUDICE.

II.     APPELLATE COUNSEL WAS INEFFECTIVE WHEN SHE FAILED TO FILE A SUPPLEMENTAL BRIEF AFTER REMAND.

- 11 -

III.    DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE COURT
        ADMITTED HIGHLY PREJUDICIAL EVIDENCE OF OTHER BAD
        ACTS THAT HAD LITTLE OR NO PROBATIVE VALUE.

IV.     DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO
        THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE DEFENDANT
        SUFFERED PREJUDICE AS A RESULT OF THE CUMULATIVE
        EFFECT OF TRIAL COUNSEL'S ERRORS.

V.      DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
        APPELLATE COUNSEL WHERE COUNSEL DID NOT RAISE THE
        ABOVE ISSUES IN HIS APPEAL OF RIGHT.

(See Def.-Appellant's Br. on Appeal, docket #31.)   The Michigan Court of Appeals and the

Michigan Supreme Court denied his application for leave to appeal on August 20, 2004 and May

31, 2005, respectively.   Both appellate courts stated that Petitioner failed to meet the burden of

establishing entitlement to relief under MICH. CT. R. 6.508 (D).   (See 8/20/04 Mich. Ct. App. Ord,

docket #31; 11/20/01 Mich. Ord., docket #32.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA).   *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert.*

*denied, Texas v. Penry*, 126 S. Ct. 2862 (June 12, 2006). The AEDPA "prevents federal habeas

'retrials'" and ensures that state court convictions are given effect to the extent possible under the

law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature

of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of

habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be

granted with respect to any claim that was adjudicated on the merits in state court unless the

adjudication:   "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law as determined by the Supreme Court of the United

- 12 -

States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1);  *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.

This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

1989).

**Discussion**

I.    **The trial court fail to properly instruct the jury on the name of the complainant and the date of the offense in question, violating Petitioner's due process right to a jury properly instructed on all essential elements of the offense.**

In his first ground for habeas corpus relief, Petitioner claims that his due process

rights were violated when the trial court failed to properly instruct the jury on the name of the

complainant and the date of the offense in question.  In Count I of the information, Petitioner was

charged with assault upon Anthony Thomas and/or Robert Mason with intent to commit the crime

of murder with regard to the incident that occurred on April 29-30, 1998.  By the close of proofs,

however, it was apparent that the intended victim of the assault was Thomas and not Mason.  Just

before closing arguments, the prosecution moved to amend the information to strike the reference

to Robert Mason in Count I.  (Tr. V, 3.)  Petitioner contends that because the trial court did not

specifically instruct the jury that Mason had been stricken as a complainant or how the evidence of

the March 1998 assault was to be used, the jurors may have been confused as to whom and on what

occasion Petitioner allegedly committed assault with intent to do great bodily harm.

In rejecting Petitioner's claim on appeal, the Michigan Court of Appeals stated:

> Defendant first argues that the trial court erred in failing to instruct the jury regarding the name of the complainant and the date of the offense, thereby depriving him of the right to a unanimous verdict. We disagree. Defendant waived review of this issue by failing to object at trial.  *People v Snider*, 239 Mich App 393, 420; 608 NW2d 502 (2000). Reversal of a conviction based on plain, forfeited error is warranted only when it results in the conviction of an actually innocent defendant or when error affects the integrity of the judicial proceedings. *People v Carines*, 460 Mich 750,

- 14 -

763-767; 597 NW2d 130 (1999). The defendant bears the burden of persuasion with respect to prejudice. *Id*. Defendant has failed to meet his burden. In any event, the general unanimity instruction was sufficient where there was no juror confusion. See *People v Cooks*, 446 Mich 503, 512-513; 521 NW2d 275 (1994). The testimony at trial by Robert Mason established that he was not an intended victim, and the prosecutor emphasized throughout his closing argument that the victim of the assaultive offense was Anthony Thomas.  Furthermore, defendant did not take issue with the date of the offense and, in fact, presented an alibi for the date alleged by the prosecution. Accordingly, defendant's claim is without merit.

(MCOA Op., 1.)

Respondent argues that Petitioner's claim is procedurally defaulted.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).   To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner

asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. 536-37.  A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

Because his claim is procedurally defaulted, Petitioner must show cause and prejudice or make a colorable claim of actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485; *House*, 547 U.S. at 536.   However, when a claim clearly is without merit, the Court may forego the procedural default analysis and proceed to directly to the merits of the claim. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003) (federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits); *Bell v. Cone*, 243 F.3d 961, 971 (6th Cir. 2001) (deciding claim on the merits, assuming without deciding that the Petitioner did not procedurally default it or could show cause and prejudice), *reversed on other grounds by Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999) (where the procedural default issue raises more questions than the case

on the merits, the Court may assume without deciding that there was no procedural default or that petitioner could show cause and prejudice for that default).

By the end of Petitioner's trial, it was abundantly clear that Count I of the information concerned a charge of assault with intent to murder Anthony Thomas arising from the shooting incident on April 29-30, 1998. As noted by the Michigan Court of Appeals, Mason testified at trial that he believed Thomas was the intended victim of the shooting. (Tr. II, 87, 90.) Moreover, while the jury was not specifically instructed by the trial court that the information was amended to strike the reference to Robert Mason from Count I (the charge of assault with intent to murder), the prosecutor's closing argument was entirely consistent with the amended information. During closing arguments the prosecutor told the jury that they no longer would have to decide whether Petitioner was shooting at Mr. Mason as that charge had been dropped. (Tr. IV. 16, 20.) The prosecutor stated in pertinent part: "You will not have to decide in your verdict whether the defendant was shooting at Rob Mason. It's been deleted. The issue is was he shooting at Anthony Thomas. Because the testimony of Rob Mason, very forthrightly was I don't think he was shooting at me." (Tr. IV, 16.) Moreover, in discussing the charge of assault with intent to murder, the prosecutor referred only to Thomas as the victim. (Tr. IV, 22-23.) Likewise, the trial court referred only to Thomas in instructing the jury on the charge on assault with intent to murder and the lesser included offenses. (Tr. IV, 67.)

It is equally clear from the trial record that the charge of assault with intent to murder arose from the April 29-30 shooting incident at Mason's house, not the March 25 incident at the recording studio. The alleged assault on March 25 involved a relatively minor altercation between Petitioner and Thomas that did not involve the use of a weapon. Throughout closing arguments, the attorneys discussed the shooting incident at Mason's house in connection with the charge of assault

with intent to murder.  The prosecutor discussed the March 25 incident only to show Petitioner was a "bully" and had a motive to harm Thomas.  (Tr. IV, 8-12).  In addition, the prosecutor was able to argue that Thomas could identify Petitioner during the April shooting incident because he previously saw him on March 25.  (Tr. IV, 14.)  The prosecutor specifically told the jury, "And the only charge before you is what happened on April 29th.  The other information from March 25th on East Genesee is to help you understand why Anthony Thomas could identify and know Peter Rabbit and the motive."  (Tr. IV, 14.)  Petitioner, therefore, cannot establish a violation of his due process rights.

II. **Petitioner was denied his constitutional right to present a defense and to the effective assistance of counsel under the Sixth and Fourteenth Amendments when his trial attorney failed to present the testimony of two witnesses, one who was with the complainant at the time the complainant claimed that the incident occurred and the other who stated the complainant told him Petitioner did not shoot at him.**

Petitioner claims in his second ground for habeas corpus relief that his trial counsel violated his Sixth Amendment right to the effective assistance of counsel when he failed to interview and present the testimony of two witnesses, Barry Siler and Charles Brooks.

A. _Ginther_ Hearing

Following a remand from the Michigan Court of Appeals, the trial court held the _Ginther_ hearing on December 6 and 8, 1999.  Charles Brooks testified that he had known Petitioner for fourteen or fifteen years and was a good friend.  (Defendant's Motion for a New Trial, Vol. I (Motion Tr. I), 62, 75, docket #23.)  Brooks knew Anthony Thomas from the street.  (Motion Tr. I, 62.)  Brooks testified that in May 1998, he and Thomas were at a barbershop at the same time.  (Motion Tr. I, 78.)  During their conversation, Thomas told him that Petitioner was not the person who shot at him, but he made a deal with Officer Sanchez to testify against Petitioner in exchange

- 18 -

for the dismissal of a drug charge against Thomas.  (Motion Tr. I, 62-64, 68, 77.)  Thomas said that

he did not know who shot at him because the four guys were wearing masks.  (Motion Tr. I, 79-80.)

Brooks told Petitioner about his conversation with Thomas about a week later when Petitioner called

him from jail.  (Motion Tr. I, 67.)  Brooks testified that he never was contacted by Petitioner's

attorney or asked to testify in the case.  (Motion Tr. I, 64.)  Brooks attended portions of Petitioner's

criminal trial, but did not inform any attorney or police officer about what Thomas had told him.

(Motion Tr. 71-72.)

        Saginaw Police Detective Vince Sanchez testified that he was not aware of any state

or federal drug charges against Anthony Thomas.  (Tr. II, 7-8.)  The following exchange took place

between the prosecutor and Detective Sanchez:

> Q:    As a result of the contacts you had with Anthony Thomas, did you ever learn that he had any case pending against him for drugs anywhere in the federal or state system --
>
> A:    No.
>
> Q:    -- at the time of the incidents?
>
> A:    No.
>
> Q:    Did you ever know of any possible charges involving drugs where he might have been found in possession of drugs that was being held over him or was weighing upon him in any way in his awareness at the time of the March 25 and April 29th incidents?
>
> A:    No, there wasn't.
>
> Q:    Did you ever make him a promise to get him out of any such drug case in order to have him testify against Peter Wicker -- or, excuse me, Thomas Wicker?
>
> A:    No, I didn't.

(Motion Tr. II, 7-8.)  Detective Sanchez further testified that Brooks' story that Anthony Thomas told Brooks that he made a deal with Officer Sanchez to give false testimony against Wicker in exchange for dropping a drug charge against Thomas did not have any basis in fact.  (Motion Tr. II, 8.)  Sanchez testified that he was aware from a background check that Thomas had a previous felony conviction for something, but did not make any promise of leniency with regard to that matter.  (Motion Tr. 9.)

        Paul Cowley, a special agent with the FBI, similarly testified that he was not aware of any potential or existing state or federal drug charges against Anthony Thomas from the time he first encountered Thomas on March 25, 1998, to the present.  (Motion Tr. I, 144-45, 147-48.)  Cowley was not aware of Thomas' involvement in any drug activity for which he was being given leniency or protection from prosecution in exchange for his testimony against Petitioner.  (Tr. I, 145.)  Cowley testified that he never promised Anthony Thomas anything in exchange for his testimony against Petitioner, nor was he aware of anyone else at the FBI or another agency making such a promise.  (Tr. I, 156.)  Cowley was aware from running a LEIN on Anthony Thomas that he had a previous narcotics conviction from the early 1990s for which he served a prison sentence.  (Motion Tr., I, 150-51.)  Cowley testified that the government  provided Thomas with the room he stayed in before the preliminary examination and $150.00 on the day of the preliminary examination for moving expenses because he no longer felt safe in Saginaw.  (Motion Tr. I, 157.)  In addition, the state flew Thomas back for the trial and paid for his hotel room.  (Motion Tr. I, 158.)

        Barry Siler testified that he was Robert Mason's cousin.  (Motion Tr. I, 88.)  Siler testified that Mason and Thomas came to his home at the Townhouse Apartments at 9:00 or 10:00 p.m. on April 29, 1998.  (Motion Tr. I, 88-89.)  They arrived in Mason's car and stayed for about

twenty minutes.  (Motion Tr. I, 89.)  They left after Mason got a call on his cell phone that someone

had shot up his house and Thomas' car.  (Motion Tr., 89, 101.)  Mason did not want his car to get

shot up, so he asked Siler to drive him and Thomas back to Mason's house on Bundy Street.

(Motion Tr. I, 90.)  When they arrived at the house about ten minutes later no one was around except

Rudy Liddell, the friend who had called Mason.  (Motion Tr. I, 91, 108.)  Mason said that he didn't

know who did it, but he was going to say that Peter Rabbit did it.  (Motion Tr. I, 108.)  Siler was at

Mason's house for five to ten minutes and left before the police arrived.  (Motion Tr. I, 109-10.)

Siler testified that while he was incarcerated in the county jail in late June 1998, a friend of

Petitioner's overheard Siler giving the above account to another inmate.  (Motion Tr. I, 92-93.)  The

friend informed Petitioner, who was incarcerated at the jail awaiting trial in this case.  (Motion Tr.

I, 96-97.)  Siler testified that he knew Petitioner from the neighborhood as "Peter Rabbit" but did

not know him personally and never had any direct contact with Petitioner in jail.  (Motion Tr. I, 94,

97.)

Siler testified that a writ was issued in order for him to be transferred to the Saginaw

County Jail so he could testify at Petitioner's trial.  Siler spent ten days in the Saginaw County Jail,

but never was called to testify.  (Motion Tr. I, 104-05.)  However, there was nothing in the trial

record to indicate that either side planned to call Siler or that a writ was issued to procure Siler's

attendance at the trial.  (Motion Tr. I, 112-14.)

Petitioner testified that he told his trial counsel, James Gust, two months before the

September trial date that he wanted Siler to be a witnesses in his case.  (Motion Tr. I, 117.)

Petitioner told Gust that Siler would testify that Mason and Thomas were with him when the

shooting incident occurred at Mason's house.  (Motion Tr. I, 117.)  Petitioner further testified that

he told Gust about Brooks within a month after his arrest.  (Motion Tr. I, 117.)  Petitioner told Gust that Brooks would testify that Thomas told him that he had made a deal to testify against Petitioner in exchange for the dismissal of drug charges against him.  (Motion Tr. I, 118.)  Petitioner testified that he did not know until the first day of trial that counsel did not intend to call Brooks and Siler as witnesses for the defense.  Petitioner claims that he told Gust that he wanted them called as witnesses, but Gust told Petitioner that he "got the case won."  (Motion Tr. I, 120.)

James Gust testified that he hired an investigator to assist him with interviewing possible witnesses.  (Motion Tr. I, 18.)  At least four possible alibi witnesses were interviewed, including Leatrice Wicker, Marilyn Moore, Traci Young and DeWayne Jilks.  (Motion Tr. I, 19.)  Gust testified that he had no recollection of the name Barry Siler and did not interview him in preparation for trial.  (Motion Tr. I, 9-10, 46-47.)  Gust later admitted that he must have known something about Siler because he asked Thomas at trial whether he knew Barry Siler.  (Motion Tr. I, 52, 59.)  Likewise, Mr. Gust had no recollection of Charles Brooks, nor did he recall Petitioner telling him that Brooks could provide testimony favorable to the defense.  (Motion Tr. I, 11, 42-43.)  Gust never spoke to Brooks or gave his name to the investigator.  (Motion Tr. I, 11.)  Gust had no independent recollection of what Petitioner may have told him, but stated that if he had been informed of Brooks' potential testimony, he would have considered it very significant and there is no reason why he would not have explored it.  (Motion Tr. I, 43-45.)

B.    State Court Decisions

The trial court issued an opinion and order on February 1, 2000, denying Petitioner's motion for a new trial.  (See 2/1/00 Op. and Ord. of Saginaw County Circuit Court, docket #30.)

- 22 -

In its decision denying Petitioner's motion for a new trial, the trial court assumed that trial counsel had been made aware of Siler and Brooks.  The trial court agreed with Petitioner that counsel's failure to at least interview the witnesses could not be considered a legitimate trial strategy, particularly when counsel was unable to provide a sound reason for his failure to do so. Nevertheless, the trial court concluded that Petitioner's failure to interview witnesses did not prejudice Petitioner.  The trial court provided the following support for its decision:

> First of all, there is absolutely no evidence that Mr. Thomas had a pending state or federal drug case or that the authorities were presently investigating or planning to investigate any such offense or any other offense for that matter.  Any testimony by Brooks would have been refuted by Detective Sanchez and FBI Agent Cowley and in all likelihood proven to be more detrimental than helpful.  As to Mr. Siler, the most charitable term that the Court can give to describe his testimony is "incredulous".  If we are to believe his story, he was with Thomas and Mason in the parking lot of the Townhouse Apartments when a call came informing Mason that his car and house had been shot up, and that he thereafter drove both Mason and Thomas back to a largely quiet scene with few if any spectators and no police.  Not only does this testimony directly contradict that of Thomas, Mason, and Officer Skabardis, a point that would undoubtedly have been stressed by the prosecution, but would have been refuted by literally half the City of Saginaw police force as well as any number of spectators, possible even one identified by Mr. Thomas by name as being in the area just prior to the shooting.  (See Prelim. Tr. 33.)  The Court does not see how any of this proposed testimony could have helped defendant's cause.  If anything it would have hurt.

(2/1/00 Op. and Ord. of Saginaw County Circuit Court, 6, docket #30.)  The Michigan Court of Appeals affirmed the decision of the trial court, stating:

> Defendant next argues that he was denied the effective assistance of counsel based on deficient performance and the failure to interview witnesses. We disagree. To establish a claim of ineffective assistance of counsel, defendant must demonstrate that his attorney's representation fell below an objective standard of reasonableness and the representation was so prejudicial that defendant was denied a fair trial. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).  Defendant must demonstrate that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id*. at 302-303. At the *Ginther* hearing held below in conjunction with defendant's motion for new trial, the trial court concluded that defendant was not deprived of a defense and the testimony of an additional

- 23 -

witness was "incredulous."  Based on the record available, defendant has failed to meet his burden of proof.

(MCOA Op., 1-2, footnote omitted.)

C.   Analysis

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466

U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'"  *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence.  *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691.  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); accord *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004).  A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them."  *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

In this case, the trial court concluded that counsel's failure to at least interview Brooks and Siler fell below an objective standard of reasonableness, thus satisfying the first *Strickland* requirement.  Nevertheless, the trial court and the Michigan Court of Appeals found that Petitioner could not show prejudice, the second requirement under *Strickland*.  With regard to the prejudice prong, the Supreme Court instructed that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

- 25 -

The trial court found that Petitioner was not prejudiced by counsel's failure to call Brooks and Siler because the testimony they would have given was not credible in light of the totality of the evidence presented at trial and evidentiary hearing.  Charles Brooks would have testified at trial that six months before Petitioner's trial, Thomas told him that Petitioner was not the person who shot at him, but he made a deal with Officer Sanchez to testify against Petitioner in exchange for the dismissal of a drug charge against him.  (Motion Tr. I, 62-64, 68, 77.)  As discussed by the trial court, Detective Sanchez and FBI Agent Cowley testified at the *Ginther* hearing that they were not aware of any potential or pending state or federal drug charge against Anthony Thomas and did offer him any deal or  promise him anything in exchange for his testimony.  (Motion Tr. I, 144-48, 156; Motion Tr. II, 7-9.)  Thus, Brooks' trial testimony would have been refuted by Detective Sanchez and FBI Agent Cowley.  In addition, Brooks' credibility would have been impugned by the facts that Brooks had been a good friend of Petitioner's for fourteen or fifteen years (Motion Tr. I, 62, 75) and Brooks had failed to inform any attorney or police officer about what Thomas had told him at any time before or during Petitioner's trial (Motion Tr. 71-72).

Siler would have testified that he was with Thomas and Mason in the parking lot of the Townhouse Apartments when Mason received a call from Rudy Liddell informing Mason that his house and Thomas' car had been shot up.  (Motion Tr. I, 88-89.)  Siler would have further testified that he drove Mason and Thomas back to Mason's house, where only Liddell was present.  (Motion Tr. I, 90-91.)  The trial court found Siler's testimony "incredulous" because it directly contradicted the trial testimony of Thomas, Mason, and Officer Skabardis.  Thomas and Mason gave detailed testimony about a group of men, including Petitioner, opened fire on them after they pulled into Mason's driveway.  (Tr. II, 28-36, 83-89.)  Thomas testified that he fled the scene on foot, while

- 26 -

Mason was able to back his car out of the driveway and drive away.  (Tr. II, 88-89.)  As he drove down the street, he ran into a police barricade and informed them about the shooting.  (Tr. II, 89.)  Mason's testimony was consistent with that of Officer Skabartis, who testified that he was working in the area of Mason's house on the night of the shooting.  (Tr. II, 135.)  As Officers Skabardis and Fong were speaking to a group of men standing at the corner of Gilmore and Russell, Mason drove up in his car and told them about the shooting.  (Tr. II, 138-39.)  According to Skabardis, Mason appeared scared and excited and told them that "Peter Rabbit" was involved in the shooting.  (Tr. II, 150.)

The trial court's finding that Siler and Brooks' testimony lacked credibility is entitled to a presumption of correctness in this Court.  *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *see also In re Byrd*, 269 F.3d 561, 576 (6th Cir. 2001) (finding by state courts in prior state collateral proceeding, that petitioner's new evidence of actual innocence lacked any credibility, was entitled to presumption of correctness in subsequent habeas proceeding); *Ellis v. Collins*, 956 F.2d 76, 79 (5th Cir. 1992) (holding that a state trial court's summary determination that affidavits lacked credibility was entitled to a presumption of correctness in federal habeas corpus proceedings).  Petitioner failed to rebut the presumption by clear and convincing evidence.  Given the degree to which the testimony of Siler and Brooks would have been refuted or contradicted by other witnesses who testified at trial and at the *Ginther* hearing, Petitioner cannot establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 694.  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*,

529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.  In light of the record, I cannot find that the decision of the Michigan courts was an unreasonable application of *Strickland*.

III.    **Petitioner was denied his Sixth Amendment right to the effective assistance of counsel because Petitioner suffered prejudice as a result of the cumulative effect of trial counsel's errors.**

Petitioner contends that his Sixth Amendment right to counsel was violated as a result of the cumulative effect of trial counsel's errors.  In addition to Petitioner's claim in Ground II, Petitioner asserts a litany of instances of ineffective assistance of counsel, including claims that counsel: (1) failed to request a cautionary instruction on the bad acts evidence; (2) failed to move for a mistrial or to suppress the use of bad acts evidence as substantive evidence of guilt; (3) failed to investigate, interview or call the following witnesses with regard to the March 25 incident - Sgt. Michael Van Horn, Officer John Meehleder, Annie Ruth Kelly and Dewayne Jilks; (4) failed to make timely objections to instances of prosecutorial misconduct; (5) failed to object to the jury instructions; (6) failed to call an expert witness to refute a police witness testimony that fingerprints evaporate from shell casings when fired; (7) failed to move for suppression of Petitioner's previous criminal convictions; (8) failed to look for any witnesses that may have observed Petitioner fishing with his relatives; (9) failed to move for a direct verdict of acquittal; (10) failed to move for a mistrial based on prosecutorial misconduct for presenting prejudicial remarks to the jury concerning his previous convictions; (11) failed to move to suppress a telephone conversation; (12) failed to file a pretrial motion to challenge the identification of petitioner; (13) failed to have the witnesses sequestered; and (14) failed to move the court to have Mason answer specific questions. Petitioner

argues that while the individual instances of ineffectiveness may not have violated his constitutional rights, he was denied a fair trial by the cumulative impact of counsel's errors.

Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.  *Duncan*, 513 U.S. at 365-66; *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.  A petitioner has fairly presented his claims when he identifies the constitutional right that he claims has been violated and the particular facts which supported his claims to the state courts.  *Onifer v. Tyxzkiewicz*, 255 F.3d 313, 315 (6th Cir. 2001).

In his direct appeal before the Michigan Court of Appeals and the Michigan Supreme Court, Petitioner raised two claims of ineffective assistance of counsel:  counsel's failure to interview and call Brooks and Siler as witness and counsel's failure to request a jury instruction on the use of bad acts evidence.  In his motion for relief from judgment, Petitioner claimed that he was denied the effective assistance of counsel as a result of the cumulative effect of trial counsel's error.

In the body of his supporting brief, Petitioner provided the following list of errors by his trial counsel:

> (a) counsel's failure to investigate and interview witnesses; (b) counsel's failure to object to the instances of prosecutorial misconduct; (c) not requesting cautionary instructions on prosecutorial misconduct during closing and rebuttal argument; (d) not moving for a mistrial; (e) not requesting specific jury instructions on the use of "bad acts" evidence; (f) failing to file pretrial motions, i.e., suppression of a telephone conversation, moving to suppress the alleged prior bad act allegation, a motion to challenge the identification of the defendant; (g) failed to have witnesses sequestered; (h) failure to request the court to compel Mason to answer specific questions, to which Mason issued an unresponsive answer; [and] (i) failure to object to the use of bad acts evidence being used as substantive evidence of guilt.

(Def.'s Br. in Supp. of Mot. for Relief From J., 27, docket #27.)  With the exception of counsel's failure to investigate and interview witnesses, Petitioner did not provide any factual development or argument with regard to the alleged instances of ineffective assistance of counsel.  He simply argued that his constitutional rights were violated as a result of the cumulative impact of counsel's errors.  Petitioner similarly presented his claim in the Michigan appellate courts.

The two claims of ineffective assistance of counsel presented on direct appeal were properly exhausted in the state courts.  In the previous section, I found that Petitioner was not entitled to habeas corpus relief as a result of trial counsel's failure to interview and call Brooks and Siler as witnesses.  In Part IV of the Discussion, *infra,* I address counsel's failure to request an instruction on the use of bad acts and conclude that counsel performance was not constitutionally deficient.  The remaining instances of ineffective assistance of counsel asserted in the habeas petition are procedurally defaulted because they were not fairly presented in the state courts.  Under Michigan law, a defendant must include specific claims of ineffective assistance of counsel in his "Statement of Questions Presented" in the Michigan Court of Appeals in order for the claim to be properly before the court.  *See* MICH. CT. R. 7.212(C)(5), and *People v. Brown*, 610 N.W.2d 234,

- 30 -

241 (Mich. Ct. App. 2000). Presenting a list of claims in the body of his brief without any factual support or discussion did not comply with Michigan law and was not sufficient to put the court of appeals on notice of his individual claims of ineffective assistance. Because the state courts were not given a fair opportunity to review the merits of his claims, Petitioner's remaining claims of ineffective assistance of counsel are unexhausted.

Exhaustion is a problem, however, only if there is a state court remedy available for petitioner to pursue, thus providing the state courts with an opportunity to cure any constitutional infirmities in the state court conviction. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Under Michigan law, a prisoner may file only one motion for relief from judgment. *See* MICH. CT. R. 6.502(G)(1). Petitioner filed his one allotted motion for relief; therefore, he has no available remedy in the state court. Because no further state remedy is available to Petitioner, the claim is procedurally defaulted. *Rust*, 17 F.3d at 160.

Review of Petitioner's claim is barred unless he can show cause and prejudice or that a lack of federal habeas review will result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536*; Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551. Petitioner claims that his appellate counsel was ineffective for failing to raise all of his claims of ineffective assistance of trial counsel on direct appeal. To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted and not procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). Petitioner raised his claim of ineffective assistance of appellate counsel in his motion for relief from judgment and in all levels of appellate review; thus, the claim was exhausted. However, because review of the claim was denied by the Michigan appellate courts pursuant to MICH. CT. R. 6.508(D),

- 31 -

the claim is procedurally defaulted.  The Michigan Court of Appeals and the Michigan Supreme

Court expressly denied Petitioner's applications for leave to appeal on the basis that Petitioner failed

to "meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D)."   Under

MICH. CT. R.  6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon

claims that were decided against him in a prior appeal or that could have been raised on direct

appeal.  For claims that could have been raised, the defendant is entitled to relief only if he can

establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown

by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of

a sound judicial process that the conviction should not be allowed to stand."   MICH. CT.

R. 6.508(D)(3)(a)-(b).

A state law procedural rule is adequate and independent when it was "firmly

established and regularly followed" at the time of the asserted procedural default.  *Rogers v. Howes*,

144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).  In

assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether,

viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be

deemed to have been apprised of the procedural rule's existence.  *Luberda v. Trippett*, 211 F.3d

1004, 1006-1007 (6th Cir. 2000).  Because MICH. CT. R. 6.508(D) was enacted in 1989 and

Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a

"firmly established" procedural rule for purposes of Petitioner's action.  *See  Luberda*, 211 F.3d at

1007; *Rogers*, 144 F.3d at 994.  Therefore, Petitioner's claim is procedurally defaulted unless

Petitioner can show cause excusing his failure to present the claim on direct appeal.  *See Edwards*,

529 U.S. at 453-54 (remanding for determination of whether the petitioner can show cause and prejudice excusing default of the ineffective assistance of appellate counsel claim).

It is unclear under Sixth Circuit precedent whether Petitioner may show cause excusing the default of his claim of ineffective assistance of appellate counsel. Arguably, because requiring Petitioner to bring a claim of ineffectiveness of appellate counsel on direct appeal would unreasonably force Petitioner to take a position at odds with the attorney representing him on appeal, cause exists for bringing an ineffective assistance of appellate counsel claim for the first time in a motion under MICH. CT. R. 6.500. *See Ivory v. Jackson*, 509 F.3d 284, 294 (6th Cir. 2007) (implicitly concluding that ineffective assistance of counsel claim was not defaulted notwithstanding the fact that it was raised for the first time in a motion under MICH. CT. R. 6.500); *Bradley v. Birkett*, 192 F. App'x 468, 474-80 (6th Cir. 2008) (same); *but see Burroughs v. Makowski*, 411 F.3d 665, 667-68 (6th Cir. 2005) (concluding that claim of ineffective assistance of appellate counsel could not serve as cause excusing procedural default because it was raised for the first time in motion under MICH. CT. R. 6.500 and was rejected by Michigan appellate courts under MICH. CT. R. 6.508(D), an implicit finding that Petitioner failed to demonstrate cause and prejudice under that rule). Nevertheless, it unquestionably is true that Petitioner failed to raise his claim of ineffective assistance of appellate counsel at his first clearly available opportunity: his application for leave to appeal to the Michigan Supreme Court. As a consequence, I conclude that his claim of ineffective assistance of appellate counsel is procedurally defaulted and cannot serve as cause for his underlying claim. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Petitioner also fails to make a cognizable claim of actual innocence in order to obtain review of a procedurally defaulted claim.  In order to meet the standard for a claim of actual innocence, the petitioner "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 327 ("[T]he standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do.  Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."); *see also  Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2005).  "[T]o be credible a gateway claim requires new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial."  *House*, 547 U.S. at 537  (internal quotation marks omitted). "[T]he *Schlup* standard is demanding and permits review only in the 'extraordinary' case."  *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327) (internal quotation omitted).

Petitioner failed to present new reliable evidence sufficient to establish that it is more likely than not that no reasonable juror would have convicted him.  While Brooks and Siler gave testimony at the *Ginther* hearing that tended to exculpate Petitioner, the evidence was not of the quality or trustworthiness required to meet the high standard for a claim of actual innocence. Because Petitioner cannot show cause and prejudice or make a colorable claim of actual innocence, his remaining claims of ineffective assistance are procedurally defaulted and may not be reviewed by the Court.

To the extent Petitioner asserts the cumulative effect of counsel's errors, his claim is without merit.  Under the AEDPA, a court only may grant habeas relief based on a misapplication

of Supreme Court law. *Bailey*, 271 F.3d at 655. The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review. "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). Because I find that Petitioner's two exhausted claims of ineffective assistance of counsel are without merit, Petitioner cannot show that the cumulative effect of the errors violated his constitutional rights. *See Seymour*, 224 F.3d at 557.

IV.   **Petitioner was denied a fair trial when the court admitted highly prejudicial evidence of other bad acts that has little or no probative value.**

In his fourth ground for habeas corpus relief, Petitioner claims that he was denied a fair trial when the trial court permitted improper "bad acts" evidence regarding Petitioner's alleged assault of Thomas on March 25, 1998, outside of the Play Style Music Studios. Petitioner raised this issue raised for the first time in his motion for relief from judgment, thus his claim is procedurally defaulted for the reasons discussed above. As a result of his default, Petitioner must show "cause" and "prejudice" or demonstrate actual innocence in order for the Court to consider his claim. [2] *See House*, 547 U.S. at 536*; Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52*.* Petitioner claims that his appellate counsel was ineffective for failing to raise this claim on direct appeal. To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted

---

[2]In Petitioner's direct appeal, appellate counsel raised a claim that defense counsel was ineffective for failing to request an instruction on the use of "bad acts" evidence, but did not raise a claim challenging the admission of the alleged "bad acts" evidence.

and not procedurally defaulted.  *Edwards*, 529 U.S. at 453; *Buell*, 274 F.3d at 349; *Coleman*, 244 F.3d at 538.  Petitioner raised his claim of ineffective assistance of appellate counsel in his motion for relief from judgment and in all levels of appellate review; thus, the claim was exhausted.  However, because review of the claim was denied by the Michigan appellate courts pursuant to MICH. CT. R. 6.508(D), the claim is procedurally defaulted unless Petitioner can show cause excusing his failure to present the claim on direct appeal.  *See Edwards*, 529 U.S. at 453-54 (remanding for determination of whether the petition can show cause and prejudice excusing default of the ineffective assistance of appellate counsel claim).

   As previously discussed, it is unclear under Sixth Circuit precedent whether Petitioner was required to bring a claim of ineffectiveness of appellate counsel on direct appeal while he was being represented by appellate counsel.  Regardless, Petitioner failed to raise his claim of ineffective assistance of appellate counsel at his first clearly available opportunity:  his application for leave to appeal to the Michigan Supreme Court.  Consequently, I find that his claim of ineffective assistance of appellate counsel is itself procedurally defaulted and cannot serve as cause for his underlying claim.

   Even if Petitioner could show cause for his default, he cannot show prejudice because his claim is without merit.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether

a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman*, 268 F.3d at 439; *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

I cannot find that Petitioner was denied a fundamentally fair trial as the result of the admission of evidence that he assaulted Thomas on March 25, 1998.  With regard to the March 25 incident at the recording studio, Thomas testified that Petitioner walked up to his car window and threatened to kill him.  (Tr.  II, 20.)  Thomas did not allege that a physical altercation occurred, although FBI Agent Cowley later testified that he saw a man fitting Petitioner's description "assaulting" Thomas.  (Tr. II, 130-31.)  The March 25 incident did not involve the use of a gun and Petitioner was not charged with assault or any other offense arising from the incident.  Thus, the March 25 bore little resemblance to the April 29 shooting incident that resulted in the instant charges against Petitioner.  Moreover, as discussed above, evidence concerning Petitioner's contact with Thomas on March 25 was probative of his motive to harm Thomas and Thomas' ability to later identify Petitioner as one of the shooters on April 29.  Petitioner, therefore, is not entitled to habeas corpus relief.

Petitioner also claims that his trial counsel was ineffective for failing to request a jury instruction on the use of bad acts evidence.  As set forth above, a petitioner asserting ineffective assistance of counsel must show that counsel's performance fell below an objective standard of

reasonableness and that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687-88. Judicial scrutiny of performance is highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

Petitioner's counsel testified at the *Ginther* hearing that he did not object to evidence regarding the March 25 incident at the Play Style Studios because Petitioner was never charged with any crimes despite Thomas' allegations that he was assaulted by Petitioner. Counsel believed that the lack of an arrest also suggested that the police did not believe Thomas' version of what occurred on March 25. (Motion Tr. I, 14-15.) Because counsel did not perceive the incident as a "prior bad act" by Petitioner, he did not request a special jury instruction. (Motion Tr., 16, 23-29.) In denying Petitioner's motion for a new trial, the trial court found that counsel did not request a jury instruction on bad acts evidence as a matter of trial strategy. The court stated:

> Prior to trial the prosecutor informed defense counsel that he intended to introduce evidence of a March 25, 1998 incident at Play Style Studio in which Mr. Thomas was allegedly threatened and assaulted by defendant. The purpose of such evidence was to show a possible motive for the subsequent assault and to buttress Thomas' identification of the defendant as one of the shooters. Defendant did not object to the introduction of this testimony not did he request a limiting instruction as to how this evidence was to be used by the jury. See CJI2d 4.11. At the hearing in this matter, counsel testified that at the time he thought this alleged prior incident had the potential of helping his case rather than hurting it and that he did not want an instruction that would categorize this event as a crime or improper act committed by defendant. It is clear from review of the trial transcript that counsel's strategy with regard to this incident was to use it to impeach Thomas' credibility by demonstrating that if this prior altercation occurred as Mr. Thomas related, defendant surely would have been arrested, charged, or at least been brought in for questioning, and the fact that nothing of the sort happened could lead a reasonable person to

conclude that Thomas had something against defendant and was willing to make up a story to get him in trouble.

Generally, a court is reluctant to substitute its judgment for that of defense counsel in matters of trial strategy. A difference of opinion as to trial tactics does not under most circumstances amount to ineffective assistance of counsel, nor does the fact that the strategy ultimately proved unsuccessful form a basis for such a finding. The trial strategy employed by trial counsel in this matter was clearly sound and supplies no basis for the relief requested.

(2/1/00 Op. and Ord. of Saginaw County Circuit Court, 3-4, docket #30.) While the issue was presented on direct appeal in the Michigan Court of Appeals, the appellate court did not address this claim.

The trial court's decision was not an unreasonable application of *Strickland*. As thoroughly explained by the trial court, defense counsel articulated a strategic reason for not requesting a jury instruction on the use of bad acts evidence. In light of the record, Petitioner cannot overcome the presumption that the challenged action could be considered sound trial strategy. Accordingly, he fails to meet the first requirement of *Strickland*. "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). The Court, therefore, need not consider whether Petitioner was prejudiced by counsel's conduct. However, for the same reasons I concluded that Petitioner was not denied a fair trial as the result of the admission of the bad acts evidence, I cannot find a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Accordingly, Petitioner is not entitled to habeas corpus relief on this basis.

**V.     The trial court abused its discretion by denying Petitioner's motion for relief from judgment and motion for evidentiary hearing where the appellant showed good cause and actual prejudice**.

Petitioner claims in Ground V that the trial court abused its discretion by denying his motion for relief from judgment and for an evidentiary hearing when Petitioner met the standard set forth in MICH. CT. R. 6.508(D)(3).  Under MICH. CT. R.  6.508(D)(3), the trial court may not grant a motion for relief from judgment if the motion alleges grounds for relief that could have been raised on direct appeal unless the defendant demonstrates cause and prejudice.  Petitioner's argument is grounded exclusively in Michigan law.  A petition states a claim for federal habeas relief only if it alleges that the petitioner is in custody in violation of the United States Constitution or laws.  *Mabry v. Johnson*, 467 U.S. 504, 507 (1984).  The federal courts have no power to intervene on the basis of a perceived error of state law.  *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987) ("The federal habeas court does not act as an additional state appellate court to review a state court's interpretation of its own law or procedure.").  Consequently, Petitioner's claim is without merit.

**VI.     Was Petitioner was denied this Sixth Amendment right to the effective assistance of appellate counsel when counsel failed to file a supplemental brief after remand.**

On direct appeal of Petitioner's conviction, the court of appeals remanded the case to the trial court for a *Ginther* hearing on Petitioner's claims of ineffective assistance of counsel. Following the evidentiary hearing, the trial court denied Petitioner's motion for a new trial. Petitioner claims that appellate counsel was ineffective for failing to file a supplemental brief in the appellate court attacking the trial court's findings and decision on the motion for a new trial.

Petitioner did not raise this issue on direct appeal or in his motion for relief from judgment in the state circuit court.  Rather, Petitioner raised this issue for the first time in his

- 40 -

application for leave to appeal the denial of his motion for relief from judgement in the Michigan Court of Appeals.  Because Petitioner did not first present his claim in his motion for relief from judgment in the state trial court, the claim is not properly exhausted.  *See O'Sullivan*, 526 U.S. at 845; *Duncan*, 513 U.S. at 365-66; *Silverburg*, 993 F.2d at 126.  However, as discussed above, Petitioner does not have an available state court remedy because he already had filed a motion for relief from judgment.  Because no further state remedy is available to Petitioner, the claim is procedurally defaulted and the Court must determine whether cause and prejudice exists to excuse the failure to present the claim in state court.  *Rust*, 17 F.3d at 160.  Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Cone*, 243 F.3d at 971; *Binder*, 198 F.3d at 178.

Even if Petitioner could satisfy the first requirement of *Strickland*, he cannot establish prejudice as the result of appellate counsel's failure to submit a supplemental brief after remand.  The same legal issues were before the Michigan Court of Appeals before and after the remand.  In deciding Petitioner's appeal after remand, the appellate court presumably had the original appellate brief and the trial court record, including the briefs and transcripts relating to the Petitioner's motion for a new trial.  Referring to the evidence presented at the *Ginther* hearing, the court of appeals concluded that Petitioner failed to meet his burden of proof.  While Petitioner argues from the evidence that the trial court's decision was erroneous, he does not allege that any new legal claims arose as a result of the *Ginther* hearing that required briefing.  Therefore, Petitioner was not prejudiced by appellate counsel's failure to submit a supplemental brief after remand.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:  August 11, 2008                          /s/ Hugh W. Brenneman, Jr.
                                                 HUGH W. BRENNEMAN, JR.
                                                 United States Magistrate Judge



**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within eleven days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).